UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DIANE COPPOLA, on behalf of her minor
son, M.C.,

          Plaintiff,

    -against-

SMITHTOWN CENTRAL SCHOOL
DISTRICT; JOSEPH IERANO; KAREN
PHILLIPS; JOHN SCOMILLIO; JONATHAN
MACALUSO; THOMAS RIVIELLO; MARK
HEGRENESS; and TARAMATIE PUTNAM,

          Defendants.

No.  24 Civ. 448

**COMPLAINT AND JURY
DEMAND**

## INTRODUCTION

1.      Plaintiff M.C. was in the first grade when he approached his parents,

Diane and Michael Coppola, about complicated feelings related to his gender identity.

This disclosure would mark the beginning of a fraught and traumatizing adolescence for

M.C.

2.      Mr. and Mrs. Coppola wanted what all parents want: for their child to be

happy. They consulted experts and did their best to understand and help M.C. navigate

his experience.

3.      Throughout the years that M.C. was a student in the Smithtown Central

School District (the "District"), Mr. and Mrs. Coppola also tried to engage teachers and

administrators about the challenges M.C. was facing and ensure he was safe and

supported.

4.      Unfortunately, as the years wore on, M.C.'s experience at school became a

living nightmare.

5.      M.C. experienced near-constant bullying and harassment because of his gender identity and presentation. His family repeatedly filed formal written complaints against students and staff. Yet the District continually failed to take the action necessary to protect M.C.

6.      M.C. experienced persistent bullying at the hands of his peers and blatant insensitivity and indifference at the hands of his teachers. Peers physically assaulted him, misgendered him, threw objects at him, verbally abused him (including issuing death threats), and treated him like an outcast.

7.      Likewise, the District took few steps to ensure M.C.'s safety and wellbeing in this increasingly hostile environment. Instead of implementing a viable safety plan, the District placed the onus of protecting M.C. on M.C. and his family. M.C. was forced to isolate himself and change classes and schools multiple times to avoid bullying.

8.      Day by day, Mr. and Mrs. Coppola bore witness to the degradation of their child's once bright and hopeful spirit. M.C. started missing classes, avoiding the school bus and after school activities, losing weight from related eating difficulties, and experiencing heightened anxiety and depression.

9.      Ultimately, Mr. and Mrs. Coppola had to make the difficult choice of removing M.C. from the District in 2023 out of fear for his safety and mental and emotional health.

10.      M.C. should have felt nurtured, supported, and safe during these formative years of his life. Instead, Defendants' callous disregard for his well-being resulted in half a decade of terror at the hands of peers and staff.

11.      Defendants' failures are morally and legally inexcusable and render them liable under federal, state, and local law.

**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT TO SUIT**

12.　The Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a). The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.　Venue lies in the Eastern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred herein.

14.　On May 2, 2023, by email to the District's counsel, the District consented to accept service of a late notice of claim pursuant to General Municipal Law § 50-e(5).

15.　On May 8, 2023, Plaintiff served a notice of claim pursuant to Education Law § 3813 and General Municipal Law § 50-e upon the District by email to the District's counsel.

16.　More than thirty days have elapsed since the notice of claim was served, and payment thereof has been neglected or refused.

17.　On August 30, 2023, M.C. underwent an examination by oral questioning by the District's counsel relative to the allegations in the notice of claim.

## PARTIES

18.     Plaintiff M.C. is 15 years old and appears in this action by and through his mother, Diane Coppola. M.C. was at all relevant times a student in the District.

19.     Defendant Smithtown Central School District is a public school district organized pursuant to Article 37 of the New York Education Law with its principal place of business at 26 New York Avenue in Smithtown, New York. It is managed by a seven-member Board of Education ("BOE") pursuant to § 1804 of the New York Education Law.

20.     New York State's Dignity for All Students Act ("DASA") requires the BOE to "create a school environment that is free from harassment, bullying and discrimination." N.Y. Education Law § 13(1). Any school employee who witnesses or learns of harassment, bullying or discrimination is mandated to report such incidents to administrators. *Id.* § 13(1)(c). Upon receiving a report, school administrators are required to thoroughly investigate it, and if the report is substantiated, "take prompt actions reasonably calculated to end the harassment, bullying or discrimination, eliminate any hostile environment, create a more positive school culture and climate, prevent recurrence of the behavior, and ensure the safety of the student or students against whom such harassment, bullying or discrimination was directed." *Id.* § 13(1)(e). BOE is required to provide guidelines to be used in school training programs that are specifically designed to "raise the awareness and sensitivity of school employees to potential harassment, bullying and discrimination" and enable them to adequately prevent and respond to such incidents. *Id.* § 13(2)(a).

21.     The District is an "education program or activity receiving Federal financial assistance" as outlined in 20 U.S.C. § 1681(a).

22. Defendant Joseph Ierano is a District employee who, at all relevant times, served as the Principal of Mt. Pleasant Elementary School. Upon information and belief, under DASA, as the principal of Mt. Pleasant Elementary School, Defendant Ierano reviewed and approved of the result his designees' investigations into all reported incidents of bias-based discrimination, harassment, intimidation and bullying of M.C. *See* N.Y. Education Law § 13(1)(d).

23. Defendant Karen Phillips is a DOE employee who, at all relevant times, served as a Fourth-Grade Teacher at Mt. Pleasant Elementary School.

24. Defendant John Scomillio is a District employee who, at all relevant times, served as the Principal of Great Hollow Middle School. Upon information and belief, under DASA, as the principal of Great Hollow Middle School, Defendant Scomillio reviewed and approved the result of his designees' investigations into all reported incidents of bias-based discrimination, harassment, intimidation and bullying of M.C. *See* N.Y. Education Law § 13(1)(d).

25. Defendant Jonathan Macaluso is a DOE employee who, at all relevant times, served as an Assistant Principal of Great Hollow Middle School.

26. Defendant Thomas Riviello is a DOE employee who, at all relevant times, served as a School Counselor at Great Hollow Middle School.

27. Defendant Taramatie Putnam is a DOE employee who, at all relevant times, served as a Music Teacher at Great Hollow Middle School.

28. Defendant Mark Hegreness is a DOE employee who, at all relevant times, served as a Music Teacher at Smithtown High School East.

## JURY DEMAND

29. Plaintiff demands a jury trial.

## FACTS

### *M.C. and his parents took steps to mitigate and address M.C.'s struggles at an early age.*

30.     Since he was very young, M.C. has been a bright, spirited, and talented child who has a positive and nurturing relationship with his family.

31.     M.C. first approached his parents, Mr. and Mrs. Coppola, in 2015 about questions related to his gender identity and sexuality.

32.     Even though he was only about seven years old at the time, M.C.'s parents knew the importance of obtaining the tools they would need to understand their child's experiences with gender and the struggles he was facing.

33.     Mr. and Mrs. Coppola quickly sought out the help of expert clinicians who could help them and M.C. process, navigate, and understand M.C.'s experiences.

34.     Mr. and Mrs. Coppola shared the clinicians' analyses with District staff and encouraged District staff to communicate directly with M.C.'s clinicians about his needs.

### *Fourth Grade: Mt. Pleasant Elementary School, 2017-2018.*

35.     During the 2017-2018 school year, M.C. attended the fourth grade at a new school—Mt. Pleasant Elementary School ("Mt. Pleasant").

36.     Prior to M.C.'s first day, Mr. and Mrs. Coppola proactively met with Mt. Pleasant's Principal, Defendant Joseph Ierano, to discuss M.C.'s struggles with gender and sexuality, and to ensure that he would feel safe and supported in his new school.

37.     As part of this meeting, M.C.'s parents made a specific request that no "boy/girl" lines be used by teachers to differentiate between students in class so that

M.C. would not have endure the embarrassment of publicly identifying with a gender that other students might perceive as not conforming with his appearance.

38. Mr. and Mrs. Coppola were aware that having to make this type of decision in front of a class of new peers would be a source of immense stress and anxiety for M.C. and wanted to preemptively avoid placing M.C. in an uncomfortable situation.

39. Rather than crafting a formal safety and support plan with M.C.'s parents, Defendant Ierano simply assured Mr. and Mrs. Coppola that M.C. would be supported at Mt. Pleasant.

40. Around that time, at the behest of Mr. and Mrs. Coppola, a representative from the LGBT Network, a non-profit organization that supports and advocates for LGBT people and their families in Long Island and Queens, contacted Defendant Ierano and offered to train school staff on gender and sexual-identity related issues.

41. Defendant Ierano declined the training.

42. The representative from the LGBT Network concurrently reached out to John Scomillio, Principal of Great Hollow Middle School, about conducting a training with school staff in anticipation of M.C. joining the school in two years.

43. Defendant Scomillio also declined the training.

44. On September 7, 2017, M.C.'s first day of school at Mt. Pleasant, Mr. and Mrs. Coppola emailed Defendant Ierano to confirm that the school would consider their specific request that classes and activities not be separated by gender.

45. M.C.'s parents asked that, in the event separation by gender was required, M.C. be permitted to stand with the girls when moving to and from class and play alongside the girls during physical education.

46.     In their email, M.C.'s parents reiterated M.C.'s anxiety over having to explain his gender identity to new students and staff.

47.     Defendant Ierano replied that same day stating that he had already spoken to M.C.'s teacher, Defendant Karen Phillips, about what he referred to as "the boy/girl thing" and that she was supportive of M.C.'s specific requests. Per Defendant Ierano, Defendant Phillips expressed that she would "do her best to not use 'boy/girl' as a distinguishing factor, but it might take some getting used to."

48.     On the very first day of school, Defendant Phillips did exactly what M.C. feared—she separated the class into separate lines for "boys" and "girls," forcing M.C. into a distressing and humiliating situation that his parents had specifically tried to prevent.

49.     M.C.'s peers laughed at him and questioned him as to why he chose to join the girls' line.

50.     Defendant Phillips did not attempt to intervene or remedy the situation.

51.     Shortly thereafter, District Assistant Superintendent Jennifer Bradshaw emailed all District principals about scheduling a trainer from the LGBT Network to meet with faculty about gender and sexual-identity related issues.

52.     Defendant Ierano did not schedule a training despite knowing that staff's knowledge and sensitivity towards these issues was paramount for M.C.'s comfort and safety in school.

53.     On or around October 18, 2017, one of M.C.'s peers, T.D., called M.C. "gay" and mocked him at school after M.C. expressed a desire to role play as a "queen" during recess.

54.     Several students who witnessed the incident informed Defendant Phillips about the incident.

55.     Upon information and belief, Defendant Phillips neither addressed nor remedied the situation.

56.     Mrs. Coppola emailed Defendant Phillips later that day to address the incident and express the importance of M.C. receiving support from teachers and staff outside the home. Mrs. Coppola inquired about why Defendant Phillips did not address the situation and asked Defendant Phillips to keep her informed of any future incidents.

57.     In her response, Defendant Phillips explained that she did not initially address the incident because she was in a rush to leave the classroom and move her car out of the busy school parking lot. When Defendant Phillips returned to the classroom, the students had already left for the day.

58.     As the school year progressed, M.C. continued to experience physical, emotional, and verbal abuse from his peers. Peers threatened to assault M.C., tampered with his food, and threw objects at him.

59.     Mr. and Mrs. Coppola kept Defendant Ierano and the Mt. Pleasant School Psychologist, Melissa Marturano, informed about the ongoing incidents.

60.     In or around February 2018, one of M.C.'s peers, C.A., shamed M.C. in front of the entire class for drawing a picture of a queen on his folder. Rather than instructing C.A. to stop and apologize, or taking any other appropriate remedial action, Defendant Phillips reprimanded M.C. for the drawing.

61.     On or about February 14, 2018, Valentine's Day, Defendant Phillips separated the students' Valentine's Day cards into boy/girl sections, again forcing M.C.

into a deeply anxiety-inducing situation by requiring him to publicly identify with a particular gender.

62.     With no choice but to select one of the sections in which to place his cards, M.C. placed his cards in the girls' section. As a result, students taunted and mocked M.C.

63.     Later that day, a male peer facetiously expressed a desire to attend a Father/Daughter dance. In response, Defendant Phillips rebuked the peer and stated, in sum and substance, "boys can't go to the Father/Daughter dance." M.C. was upset to hear this, especially because he had considered going to this dance.

64.     Defendant Phillips—who had been repeatedly made aware of M.C.'s struggles with gender identity and the need for heightened sensitivity around these issues—continued to show blatant indifference to the mental stress her words and actions caused M.C.

65.     Upon information and belief, no employees at Mt. Pleasant ever reported harassment, bullying, or discrimination against M.C. as required by DASA, despite witnessing such harassment, bullying and discrimination.

66.     In May 2018, Mr. and Mrs. Coppola filed their first formal complaint under DASA after one of M.C.'s peers, T.D., threatened to strangle M.C.

67.     On or about May 25, 2018, Defendant Ierano informed M.C.'s parents that the DASA complaint was substantiated.

68.     To remedy the situation, the school assigned a full-time teacher aide "to supervise the behavior of the offender."

69.     However, rather than supervising T.D., the offender, the aide would regularly surveil and follow M.C., causing M.C.'s peers to ask him whether the aide was assigned to him.

70.     Despite the school implementing this so-called safety plan, T.D. continued to taunt and bully M.C., including by uttering profanities at him.

71.     Upon information and belief, Defendants took no further steps to monitor T.D., mitigate the hostile situation, or promote a safer environment for M.C. following the filing of this substantiated complaint.

72.     M.C. grew increasingly demotivated and anxious about reporting instances of bullying to his teachers, particularly given the school's demonstrated inability to protect M.C. from his abusers.

73.     On or about June 2018, Mr. and Mrs. Coppola learned that students at M.C.'s school had created an "I Hate [M.C.] Club."

74.     In a conference call that month among M.C.'s parents, Defendant Ierano, and Ms. Marturano regarding M.C.'s bullying, Mr. Ierano was dismissive of M.C.'s experience at school and stated in sum and substance "not everyone is going to be nice to your son."

75.     Around May 24, 2018, M.C.'s parents filed a second DASA complaint after Defendant Phillips failed to intervene when a tour guide divided students into gendered lines during a class field trip and then reprimanded M.C. publicly for not queuing in the "correct line." M.C. began to cry and experienced significant shame and distress. In tears, M.C. approached Mrs. Coppola, who was chaperoning the trip and had witnessed the incident. Mrs. Coppola reassured M.C. that he was standing in the right place and that his teacher should have stood up for him.

76.     On or about June 18, 2018, Defendant Ierano, who investigated the complaint, indicated that there was "no evidence to support a finding of discrimination."

77.     Defendant Ierano did not provide any further information concerning the investigation. Upon information and belief, no remedial action was taken.

78.     Around May 29, 2018, the District scheduled a presentation by Julie Grey Owens of the Long Island Transgender Advocacy Group for the teachers at Mt. Pleasant.

79.     The training occurred mere weeks before the end of the school year and after M.C. had already been subjected to a year of significant emotional distress, thereby rendering it largely useless.

80.     Ms. Owens reported after the training that she was not given sufficient time to complete her presentation, specifically because a teacher interrupted to voice lengthy objections to the content of the presentation.

81.     Ms. Owens also reported that Defendant Ierano, who was present at the training, did nothing to intervene, halt, or redirect the teacher's discriminatory monologue.

82.     Additionally, Ms. Owens reported that Defendant Phillips confided to Ms. Owens that she did not know how to address the incident between M.C. and the field trip tour guide.

83.     During the final months of the 2017-2018 school year, M.C. began missing school, including formative and celebratory end-of-year activities like "Fun Run" and "Field Day." Because of the school's lack of support over the course of the year, M.C. grew uncomfortable and afraid of his peers.

84.     In an effort to provide some positive activities and experiences for M.C., Mr. and Mrs. Coppola hired a private vocal coach to start training with M.C., who had a deep passion for singing and the arts.

85. Throughout M.C.'s fourth grade year at Mt. Pleasant, Mr. and Mrs. Coppola witnessed his self-esteem, spirit, and health rapidly decline. In fact, Dr. Abbe, M.C.'s psychologist, encouraged his parents to remove M.C. from the school. Dr. Abbe found the environment to be so mentally damaging that she worried for his safety.

### Fifth Grade: Mills Pond Elementary School, 2018-2019

86. During the summer between M.C.'s fourth and fifth grade years, M.C.'s psychologist, Dr. Deena Abbe, suggested to M.C.'s parents that he transfer out of Mt. Pleasant because of the unwelcoming environment he had experienced there.

87. In a letter to an Assistant Superintendent of the District dated July 11, 2018, Dr. Abbe wrote that M.C. experienced "serious, unnecessary, and developmentally harmful conflict and stress" in situations when he was "asked to pick a gender, or when task demands are placed upon him regarding his gender." She further described how, during fourth grade, M.C. had been "placed in numerous situations that caused him significant harm, which created social, emotional, and academic difficulties" for him.

88. With little faith in Mt. Pleasant's ability to keep their child safe as required by law, Mr. and Mrs. Coppola ultimately made the decision to transfer M.C. to another school within the District, Mills Pond Elementary School ("Mills Pond"), for the 2018-2019 school year, when M.C. was in fifth grade.

89. Although the environment at Mills Pond was substantially safer than Mt. Pleasant had been, M.C. continued to experience discrimination and bullying by both peers and staff.

90. In February 2019, during what should have been an exciting and happy event, M.C. was publicly shamed by his Orchestra teacher for wearing heeled shoes to

his first violin concert. This caused M.C. to experience extreme stress and embarrassment.

91.     At the end of the year, M.C. yet again did not attend his school's "Field Day" to avoid being teased and bullied by his peers.

92.     In May 2019, a cousin of one of M.C.'s classmates from Mt. Pleasant sent M.C. several messages over Instagram calling M.C. "gay," "a gay fag," and a "fagget." M.C.'s parents filed a police report and informed the District about the incident.

93.     Mrs. Coppola alerted Defendant Riviello and provided him with screenshots of the messages. Without responding to Mrs. Coppola, Defendant Riviello forwarded the message to Defendant Scomillio simply saying "FYI."

94.     Defendant Scomillio did not acknowledge the incident at all to Mrs. Coppola. Upon information and belief, the District took no meaningful remedial action to protect M.C.

95.     That same month, on a tour of M.C.'s future middle school—Great Hollow Middle School ("Great Hollow")—school personnel indicated that physical education changing rooms were gendered, and said that instead of using these gendered rooms, M.C. could either change in the school nurse's office or in a private bathroom located away from the gymnasium in the cafeteria where students could see M.C. coming and going.

96.     Mr. and Mrs. Coppola expressed that both options forced M.C. into an uncomfortable situation and would draw unwanted attention from staff and peers.

97.     M.C. additionally voiced his concerns about the assignment of gym lockers, where he would store his personal items, and which gendered group he would stand with during physical education.

98.     In August 2019, prior to the start of the sixth-grade school year, District personnel decided to permanently separate M.C. and T.D. in an attempt to formulate a safety plan for M.C.

99.     M.C.'s struggles at school also had a direct impact on the rest of his family, particularly his older sister, who experienced severe emotional distress after witnessing M.C.'s psychological and emotional decompensation.

### Sixth Grade: Great Hollow Middle School, 2019-2020

100.    In September 2019, M.C. began attending Great Hollow for sixth grade.

101.    In response to M.C.'s concerns about using gendered bathroom facilities at school, District personnel provided M.C. with a large and conspicuous blue bathroom pass for a single-occupancy bathroom. The bathroom was located in the cafeteria far from M.C.'s classes and students from all grades could see M.C. going to and from the bathroom.

102.    School staff repeatedly questioned M.C. about why and from whom he had obtained the pass, to the point that M.C. was so humiliated, he stopped using the restroom altogether while at school.

103.    On or around September 27, 2019, L.A., one of M.C.'s peers, approached M.C. in his neighborhood, called him "gay," and mocked M.C. for having no friends.

104.    M.C. was shocked by the vitriolic nature of the interaction since he was unfamiliar with L.A. and had never met him before.

105.    A parent of another student who witnessed the incident was forced to intervene.

106.    On or about October 3, 2019, Mr. and Mrs. Coppola informed Defendant John Scomillio, the Principal at Great Hollow, of the incident with L.A.

107.     In response, Defendant Scomillio simply replied: "thank you for the information. Please let us know if anything else happens."

108.     Unsurprisingly, given the school's lack of a meaningful response, L.A. continued to taunt and bully M.C., and would frequently intrude into M.C.'s personal space in the hallway.

109.     Mr. and Mrs. Coppola requested that the District separate L.A. from M.C.

110.     The District subsequently assured Mr. and Mrs. Coppola that the matter had been addressed; however, L.A.'s harassment and bullying continued.

111.     The daily peer bullying only came to a halt after the COVID-19 pandemic precipitated school closures and a transition to virtual learning. Despite this temporary respite, M.C. struggled with eating and self-esteem issues.

112.     In addition to his issues at school, Dr. Abbe began working with M.C. to address his stress-induced nutritional deficiencies. To date, M.C. continues to struggle with an eating disorder.

113.     In June 2020, M.C. was prescribed psychotropic medications, including Prozac and Abilify, in order to manage the symptoms of major depression resulting from the bullying and harassment he was suffering at school.

***Seventh Grade: Great Hollow Middle School, 2020-2021***

114.     M.C. began 7th grade in the fall of 2020 under a hybrid schedule that included some remote classes and some in-person instruction.

115.     During this time, M.C. developed an interest in German language and began taking German classes at school.

116.    Around this time, M.C.'s parents informed the District that one of M.C.'s former fourth grade bullies, C.A., was taunting M.C. in their seventh-grade German class.

117.    The harassment became so unbearable that, despite his love for the language and ongoing German vocal training, M.C. asked his parents to be moved out of the class only days into the new school year.

118.    The District informed M.C.'s parents that such a move risked a loss of credits, thereby forcing M.C. to remain in the unsafe environment of his German class.

119.    On or about April 20, 2021, C.A. was taunting and insulting M.C. during a physical education class. In frustration, M.C. made a kicking motion at C.A. In response, C.A. violently pushed M.C. to the floor and threated to punch M.C. in the face.

120.    M.C.'s parents filed a third formal DASA complaint as a result of this incident. Mrs. Coppola also reached out to Defendants Scomillio, Macaluso, Ierano, Phillips, and Riviello to inform them about what had happened.

121.    On or about April 26, 2021, Defendant Macaluso informed M.C.'s parents that the complaint was unfounded and blamed M.C. for instigating his own bullying. The District took only half-hearted corrective measures in response to the incident, such as separating M.C. and C.A. "when possible" and initiating conflict resolution between the two.

122.    Despite the school's stated plan to separate M.C. and C.A., M.C.'s parents learned that C.A. approached M.C. in German class later that week and mocked him in front of a peer.

123.    As of April 2021, despite his deep love for the language, M.C. could no longer emotionally withstand the incessant bullying and was forced to switch out of his

German class and into French class to avoid further bullying by C.A., which school staff had failed to curb.

124.    Further, in health class, M.C. was paired with T.D., the same student who had threatened to strangle M.C. in fourth grade and whom the District had *specifically* planned to separate from M.C.

125.    M.C.'s parents again requested that the District address the situation and separate T.D. from M.C.

126.    Like the situation with C.A., the District placed the onus on M.C. to change his class schedule to avoid incidents with T.D.

127.    M.C. also faced instances of insensitivity from teachers and staff. For instance, a student teacher misgendered M.C., causing the entire class to laugh at him.

128.    M.C. also noticed that the single-occupancy restrooms that he relied upon were out of order for long periods of time. After school, these bathrooms would oftentimes remain locked so that M.C. was unable to enjoy after-school activities.

129.    In May 2021, M.C. refused to attend school after a peer overheard L.A. telling other students that police officers had visited L.A.'s home and that he had guns and drugs, as well as a list of people he was going to kill.

130.    Mr. and Mrs. Coppola provided this information to the District. While Defendant Scomillio claimed to have taken action to ensure the students' safety, he told M.C.'s parents that the school could not "1000%" guarantee M.C.'s safety.

131.    Around this time, M.C.'s music teacher, Ms. Taramatie Putnam—with whom M.C. had a historically supportive and nurturing relationship—learned that M.C. identifies as gay.

132.     M.C. noticed a marked change in the way that Ms. Putnam interacted with him. For example, despite knowing that M.C. was an exceptional vocal and acting talent, Ms. Putnam started suggesting that M.C. audition for minor, traditionally-male roles in the school play.

133.     Specifically, M.C. expressed an interest in auditioning for the lead role of Elsa in the school's rendition of "Frozen." Ms. Putnam, however, voiced her objection and suggested that M.C. would be better suited for secondary male roles. This rejection from a beloved teacher was devastating for M.C.

134.     On or about June 15, 2021, L.A. confronted M.C. in the school cafeteria, taunted him, and pretended to cough and sneeze on him.

135.     L.A. also threatened to fight M.C.

136.     M.C. reported the incident to the teacher on lunch duty, who replied in sum and substance that it was "hard to do something" about L.A.

137.     M.C.'s parents filed a fourth DASA complaint as a result of the incident involving L.A.. The complaint was ultimately confirmed by Defendant Macaluso to be substantiated. Nevertheless, the District continued to respond to incidents of harassment and bullying with inadequate corrective measures that failed to ensure M.C.'s safety.

138.     Just days after the incident involving L.A., M.C.'s parents were forced to file a subsequent DASA complaint after a student in M.C.'s orchestra class harassed M.C. about whether he was a "boy or a girl."

139.     Again, the DASA complaint was investigated and substantiated. And again, the District failed to take any action to end the harassment and create a safer school environment for M.C.

140. On or about June 17, 2021, M.C.'s parents received a call from Defendants Scomillio and Macaluso that M.C. was deeply upset after he and another student engaged in a verbal altercation.

141. District staff informed M.C.'s parents that this student made fun of the way M.C. referred to himself and told M.C. that no one cared what M.C. had to say about anything.

142. After the altercation, M.C. returned to his class bottle rocket assignment in an attempt to remove himself from and diffuse the situation.

143. District staff explained that at the end of the class period, one student threw water at M.C. while another taunted him and told M.C. that no one liked him.

144. A teacher was forced to intervene.

145. During the conversation, Defendant Scomillio agreed with M.C.'s parents that "serious interventions" were needed to ensure M.C.'s safety and that there would be a follow-up meeting.

### Eighth Grade: Great Hollow Middle School, 2021-2022

146. In September 2021, M.C. commenced the eighth-grade school year at Great Hollow Middle School.

147. On or about November 30, 2021, a student in M.C.'s math class referred to M.C. as "dude," despite M.C. asking them to stop, and asked if M.C. was a girl.

148. M.C.'s parents filed a sixth DASA complaint.

149. M.C. also reported the incident to the school guidance counselor, Thomas Riviello.

150. On or about December 17, 2021, casting decisions were announced for the upcoming "Frozen" production. Both M.C. and another student, M.L.C., were listed as the lead character, Elsa.

151. On or around January 11, 2022, the music teacher, Ms. Putnam, publicly admonished M.C. for coming to a rehearsal, stating, "why are you here? I don't need you today," causing M.C. great shame and embarrassment.

152. From that moment onwards, it was apparent to M.C. that Ms. Putnam did not want him to play the role of Elsa.

153. Ms. Putnam's antipathy toward M.C. was so palpable that other students, including M.C.'s friends, began avoiding him out of fear that she would treat them less favorably because of their association with him.

154. Around this time, M.C. and his parents also received notice that he had not been nominated by Ms. Putnam for the Suffolk County Music Educators' Association ("SCMEA"), an organization that awards scholarships and provides professional development opportunities to students with exceptional talent.

155. Throughout the duration of "Frozen" rehearsals that school year, Ms. Putnam continued to discourage, publicly chastise, and undermine M.C.'s performance in front of his peers.

156. On or about March 22, 2022, Plaintiff filed a complaint with the New York State Division of Human Rights based on the District's failure to adequately address and mitigate years of gender-based discrimination that M.C. experienced from 2017-2022 from both peers and staff.

157. On or about April 28, 2022, Mr. and Mrs. Coppola filed their seventh DASA complaint after a student, J.M., questioned why anyone would go to the school

prom with M.C., told M.C. that he was "an embarrassment," and discouraged M.C. from attending prom.

158.    Assistant Principal Peter Russo investigated the complaint and deemed it unsubstantiated, without providing any further information as to the nature of the investigation or the basis for this finding.

159.    M.C. was so demoralized by the bullying he had faced at Great Hollow that he did not attend the last few weeks of school, his eighth-grade graduation, or the year-end dance.

### Ninth Grade: Smithtown High School East, 2022-2023.

160.    M.C. attended his first year of high school at Smithtown High School East, where he continued to endure peer bullying and harassment.

161.    In the beginning of the year, a student that M.C. knew from middle school started antagonizing M.C. in the hallway, repeatedly calling him a "bitch," and saying "fuck you" to M.C. while he passed by.

162.    M.C. reported the bullying to Assistant Principal Michael Aleci multiple times. However, the school was unable to meaningfully prevent the behavior, and M.C. experienced verbal abuse from this student for almost the entire school year.

163.    In order to avoid this student, M.C. began isolating himself. He ate lunch alone in the principal's office or the library nearly every day.

164.    At the end of the school year, the school finally organized a mediation between M.C. and the other student, but not before M.C. endured an entire year of unimpeded bullying. The mediation occurred only after Mr. and Mrs. Coppola filed a DASA complaint about the harassment—their eighth since M.C. began attending District schools.

165. Around December 19, 2022, Mrs. Coppola emailed Assistant Principal Aleci to notify him that someone had written "Fuck The Gays" on the ceiling of the bathroom that M.C. used.

166. Although the District called the police, very little came of the investigation. The police did not identify or reprimand the offending individual and the District failed to notify parents about the incident. In contrast, the District has typically issued such notification about similar incidents involving ethnic or racial bias.

167. In addition to peer bullying, M.C. continued to experience staff insensitivity and intolerance.

168. Specifically, in a meeting with Mr. and Mrs. Coppola at the beginning of the school year, Music Teacher Mark Hegreness demanded in a hostile tone that M.C.'s parents explain their request that staff address M.C.'s use of "they/them" pronouns, indicating to Mr. and Mrs. Coppola that he was annoyed with M.C.'s pronoun preferences. He also questioned M.C.'s parents about whether they discussed M.C.'s changing voice with him, and antagonistically insinuated that M.C. would no longer be a compelling vocal performer as puberty caused his vocal range to diverge from his gender expression.

169. Defendant Hegreness further antagonized M.C. in his treble choir class. On one such occasion, Hegreness derisively referred to M.C. as, in sum and substance, "a musical theater kid who pretends he can sing but can't."

170. Defendant Hegreness also excluded M.C. from the school's chamber choir. M.C. was devastated at being excluded from an activity where he believed he might finally be able to find a welcoming community and alleviate some of the stress he felt at school.

171. On or around May 16, 2022, the BOE released a letter educating community members about the importance of respecting students' preferred pronouns. Notably, however, BOE members John Savoretti, Stacy Murphy, and Karen Wontrobski-Ricciardi did not sign onto the letter, further indicating the BOE's disunified position about supporting students with differing gender identities and expression.

172. After yet another difficult year in Smithtown Central School District where teachers and administrators again failed to keep M.C. safe, M.C. was forced to leave the District completely and attend private school for the remainder of high school.

173. As a result, M.C.'s parents must pay tens of thousands of dollars in annual tuition so that M.C. can be educated in a safe and supportive environment.

174. On February 24, 2023, after investigating the numerous instances of harassment, bullying, and discrimination that M.C. experienced at Smithtown Central School District, the New York State Division of Human Rights found probable cause to believe that the District "engaged in or is engaging in the unlawful discriminatory practice complained of."

175. But it is too little too late for M.C., who suffered six years of bullying, harassment, and discrimination due to Smithtown Central School District's failure to protect him from cruel and relentless bullying and discrimination from peers and school staff.

# CAUSES OF ACTION

## FIRST CLAIM
## TITLE IX – 20 U.S.C. § 1681
### (Against Defendant Smithtown Central School District)

176.    Plaintiff realleges the preceding paragraphs as if set forth here.

177.    At all relevant times, M.C. was a student enrolled in schools controlled, operated, and overseen by the District.

178.    At all relevant times, the District received federal financial assistance.

179.    The District owed a duty to protect M.C. from gender-based discrimination, including sexual and gender-based harassment, bullying, intimidation, and a hostile education environment.

180.    The District discriminated against M.C. by subjecting him to different treatment on the basis of his gender, including by subjecting him to sexual and gender-based harassment, bullying, intimidation, and a hostile educational environment.

181.    The District failed to prevent, respond to, adequately investigate, and/or appropriately resolve and remedy instances of gender discrimination against M.C., including sexual and gender-based harassment, bullying, intimidation, and a hostile educational environment.

182.    The District was deliberately indifferent to the risk that other students would discriminate against, harass, bully, and intimidate M.C. and subject him to a hostile educational environment.

183.    The District had actual knowledge that other students, as well as staff, were subjecting M.C. to gender-based discrimination, harassment, bullying, intimidation, and a hostile educational environment, but failed to protect M.C.

184.    As a direct and proximate result of the District's unlawful discrimination, M.C. suffered damages.

### SECOND CLAIM
### New York State Human Rights Law, N.Y. Executive Law § 296(6)
### Against All Defendants

185.    Plaintiff realleges the preceding paragraphs as if set forth here.

186.    The District is an educational institution as defined by New York Executive Law § 292(40)(c).

187.    During all times relevant to this claim, Defendants Ierano, Scomillio, Macaluso, Riviello, Phillips, Putnam, and Hegreness were employed by the District.

188.    Defendants Ierano, Scomillio, Macaluso, Riviello, Phillips, Putnam, and Hegreness are not "school officers" within the meaning of N.Y. Education Law § 2 and claims again them are therefore not subject to the requirements of N.Y. Education Law § 3813(1).

189.    The District discriminated against M.C., in violation of N.Y. Executive Law § 296(4), by subjecting him to different treatment on the basis of his sexual orientation and gender identity or expression, including by subjecting him to harassment, bullying, intimidation, and a hostile educational environment; by failing to prevent, respond to, adequately investigate, and/or appropriately resolve and remedy instances of unlawful discrimination; and by exhibiting deliberate indifference to the risk that he would be subjected to unlawful discrimination and a hostile educational environment.

190.    Defendants Ierano, Scomillio, Macaluso, Riviello, Phillips, Putnam, and Hegreness aided and abetted the District's unlawful discrimination against M.C. by failing to prevent, respond to, adequately investigate, and/or appropriately resolve and

remedy instances of unlawful discrimination, including bullying, harassment, intimidation, and a hostile educational environment on the basis of sexual orientation and gender identity or expression.

191.    As a direct and proximate result of Defendants' unlawful discrimination, M.C. suffered and will continue to suffer harm, including but not limited to loss of educational opportunities, humiliation, embarrassment, reputational harm, emotional, physical, and psychological distress, and other damages.

### THIRD CLAIM
### New York State Civil Rights Law §§ 40-c and 40-d
### Against Defendants Ierano, Scomillio, Macaluso, Riviello, Phillips, Putnam, and Hegreness

192.    Plaintiff realleges the preceding paragraphs as if set forth here.

193.    The acts and omissions by Defendants Ierano, Scomillio, Macaluso, Riviello, Phillips, Putnam, and Hegreness alleged herein subjected M.C. to discrimination and harassment in the exercise of his civil right to education under New York law because of his sexual orientation and gender identity or expression.

194.    The acts and omissions by Defendants Ierano, Scomillio, Macaluso, Riviello, Phillips, Putnam, and Hegreness alleged herein aided and incited unlawful discrimination against and harassment of M.C. by others in the exercise of his civil right to education under New York law because of his sexual orientation and gender identity or expression.

195.    The violations of M.C.'s rights under the New York State Civil Rights Law are the actual direct, and proximate cause of the injuries and damages suffered by M.C. as alleged herein.

## FOURTH CLAIM
## Negligence
## Against All Defendants

196.    Plaintiff realleges the preceding paragraphs as if set forth here.

197.    Defendants owed a duty of care to M.C. as a student in the Smithtown Central School District.

198.    At all relevant times, Defendants were under a legal duty to adequately supervise M.C. and the rest of the students in their charge at Mt. Pleasant Elementary School, Great Hollow Middle School, and Smithtown High School East, and to exercise such care of M.C. and his fellow students as a parent of ordinary prudence would observe in comparable circumstances.

199.    Defendants breached the duty of care that they owed to M.C. by allowing him to be bullied, harassed, and assaulted, failing to provide him with necessary and proper care and supervision, failing to detect and remedy the bullying, harassment, and assault of M.C. by other students, and failing to properly supervise M.C. and the students responsible for bullying, harassing, and assaulting him.

200.    These breaches of Defendants' duty and care proximately caused M.C.'s damages and injuries as described herein.

201.    The District is vicariously liable for the tortious conduct of its employees as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

    A.  Compensatory damages in an amount to be determined at trial;

    B.  Punitive damages against all Defendants, except the District, in an amount to be determined at trial;

    C.  An award of reasonable costs and attorneys' fees under 42 U.S.C. § 1988, New York Executive Law § 297, and/or any other applicable law;

    D.  Pre- and post-judgment interest to the fullest extent permitted by law; and

    E.  Any additional relief the Court deems just and proper.

Dated:      January 22, 2024
              New York, New York

                                KAUFMAN LIEB LEBOWITZ & FRICK LLP

                                _____/s/_____
                                David A. Lebowitz
                                Poojitha Shivaprasad

                                18 E. 48th Street, Suite 802
                                New York, New York 10017
                                (212) 660-2332
                                dlebowitz@kllf-law.com
                                pshivapraad@kllf-law.com

                                DAWN MURPHY, ESQ.

                                195 E. Main Street
                                Smithtown, NY 11787
                                (631) 584-2262
                                dawnmurphyatty@yahoo.com

                                *Counsel for Plaintiff*